# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | NO. 11-468--06 |
| WILLIAM TORRES : | |

## MEMORANDUM OPINION AND ORDER

**Rufe, J.**                                                                                                                                                **December 19, 2012**

      The superseding indictment in this case charges Defendant William Torres ("Torres") with: 1) conspiring with twelve co-defendants to distribute and possessing with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin in violation of 21 U.S.C. §841(a)(1), (b)(1)(A) from June 2008 through July 21, 2011(Count 1); 2) knowingly and intentionally possessing with intent to distribute, and aiding and abetting in possession with intent to distribute a mixture and substance containing a detectable amount of heroin in violation of 21 U.S.C. §841(a)(1), (b)(1)(C) on March 3, 2011 (Count 8); 3) knowingly possessing a firearm and aiding and abetting the possession of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §924(c)(1) and (2) on March 3, 2011 (Count 9).

      Torres has filed a motion to suppress: 1) shotgun shells found in plain view in Torres's residence at 1812 East Tusculum Street, Philadelphia, Pennsylvania ("1812 East Tusculum") which were seized during a warrantless "protective sweep" of the residence on March 3, 2011; 2) evidence found on Torres's person during his arrest, also on March 3, 2011, including a key to

1812 East Tusculum, a round of ammunition, a cellular phone, and $108; and 3) evidence found during a later search, pursuant to a warrant, of 1812 East Tusculum, including the two firearms listed in the superseding indictment, shotgun shells and other ammunition, a box filled with bundles of packaged heroin stamped "Nite Life" (a total of 450 packets), drug paraphernalia, over $1500 in cash, two cellular phones, and proof that Torres resided at that address, including photographs and an insurance card issued to him.

On September 6, 2012, the Court held a hearing on Defendant's Motion to Suppress.

## I. FINDINGS OF FACT

1. Officer Robert Clark is a Philadelphia Police Officer with over 20 years of experience. At the time of the relevant events in this case, he was assigned to the FBI Safe Streets Violent Gang Task Force.[1]

2. In December 2010, Officer Clark began investigating a drug conspiracy, the Medina drug trafficking organization, of which Torres is charged as a member.[2]

3. On January 4, 2011, Philadelphia police officers and FBI agents searched 4203 Bodine Street in Philadelphia, the home of Claudio Santos, one of Torres's co-defendants in the alleged drug conspiracy, pursuant to an arrest warrant for Santos and a search warrant for his home.[3] Santos was arrested based on evidence that he was involved in two separate shootings.[4]

4. During the January 4, 2011 investigation, a cooperator informed officers that Torres

---

[1] 9/6/12 Hr'g Tr. 9.

[2] Tr. 10.

[3] Tr. 14-15.

[4] Tr. 14-15.

2

was removing drugs from the 2800 block of Water Street and taking them to the 1800 block of East Tusculum Street. Officers and FBI agents drove to East Tusculum Street, where they observed Torres at the front door of 1812 East Tusculum. A woman had just exited that residence and stepped into a taxi. Then, Torres went back inside and shut the door.[5]

5. Officer Stanley Davis followed the taxi and stopped it for an investigation of the passenger. She identified herself and stated that she lived at 1812 East Tusculum.[6]

6. The Officers at 1812 East Tusculum noticed motion detectors go off at the rear of the property, but could not access that area. They attempted to talk to Torres, but discovered that he was no longer in the house, and that the back door was open.[7] Two cooperating sources told officers that Torres had fled from his residence.[8]

7. The Officers took no further action on that date.[9]

8. On February 27, 2011, Hector Plaza was killed. The same two cooperating sources who had provided information in the earlier shooting investigation informed police that Plaza was killed because of a confrontation involving Plaza, Torres, and a third man, and that the conflict was related to the Medina drug trafficking organization.[10] Between February 27 and March 3, 2011, the police were also informed that Torres "had intimate knowledge about [the

---

[5] Tr. 16.

[6] Tr. 16.

[7] Tr. 17.

[8] Tr. 17.

[9] Tr. 17.

[10] Tr. 18.

Plaza] murder" and that he was planning to flee Philadelphia.[11]

9. Prior to the events of March 3, 2011, police only knew Torres as "Will" or "Willow." They did not know his last name, birth date, or other biographical information about him.[12]

10. From the two informants,[13] police had learned that Torres lived at 1812 East Tusculum, was a "case worker" or "shift supervisor" in the Medina drug trafficking organization, and kept drugs and possibly weapons in his residence.[14] The informants had provided reliable tips to the police in the past. One had provided "a handful" of tips, and the other "hundreds."[15]

11. On March 3, 2011, Officer Clark established surveillance of 1812 East Tusculum. Nearby, but not in front of 1812 East Tusculum, a SWAT team, two uniformed officers in a marked car, and other officers and agents waited.[16]

12. Shortly after Officer Clark established surveillance,[17] he observed a man generally meeting Torres's description leave the property and walk westbound.[18] Officer Clark alerted the SWAT team, which drove down East Tusculum Street in a marked vehicle toward the man.

---

[11] Tr. 18.

[12] Tr. 19.

[13] Tr. 33.

[14] Tr. 32-33.

[15] Tr. 33.

[16] Tr. 19.

[17] Approximately 20 minutes had elapsed. Tr. 34.

[18] At Tr. 19, the testimony states that this man exited 1818 East Tusculum, rather than 1812 East Tusculum. However, all other references to this individual indicate that he was actually seen exiting 1812 East Tusculum. Therefore, the Court finds that he exited 1812 East Tusculum.

4

When the man spotted the vehicle, he fled on foot.[19] When he turned to run south on Kensington Avenue, Officer Clark also pursued him in his vehicle.[20]

13. That individual was later identified as Christopher Torres ("Christopher"), not Defendant. The two men are unrelated.

14. Christopher continued to run, and, while running through a lot between Oakdale Street and Lehigh Avenue, dropped three bundles, each containing 15 clear plastic packets stamped "Nite Life" and filled with an off-white powder.[21] "Nite Life" is the "brand" name used by the Medina drug trafficking organization.[22] The heroin found in the Santos home was also marked "Nite Life."[23] The substance Christopher discarded was field tested and found to be heroin.[24]

15. Once the officers detained Christopher, they determined that he was not William Torres as they had believed.[25] In the course of his arrest, they learned Christopher's name and date of birth, and that he also lived at 1812 East Tusculum.[26]

16. Officer Clark had no evidence or information to indicate that anyone was in the home

---

[19] Tr. 19.

[20] Tr. 20.

[21] Tr. 20.

[22] Tr. 20.

[23] Tr. 20.

[24] Tr. 24.

[25] Tr. 21.

[26] Tr. 35.

5

after Christopher left.[27] However, Officer Clark believed that William Torres or his girlfriend might be in his home at 1812 East Tusculum, and further, believed that there was a risk that Torres might destroy or move evidence in light of Christopher's arrest.[28]

17. After arresting Christopher, officers returned to 1812 East Tusculum, and knocked on the door.[29] Hearing no response to the knock, officers entered through the unlocked front door,[30] walked through the home, and found it unoccupied.[31]

18. During the walk-through, officers observed shotgun shells in plain sight in the living room.

19. The officers left the house, and secured it so that nobody could enter.[32]

20. Officer Clark returned to headquarters to prepare an application for a search and seizure warrant for the property.[33] The application for the warrant noted, *inter alia*, that officers had viewed shotgun shells inside 1812 East Tusculum when they entered to ensure that it was unoccupied.

21. While at police headquarters, Officer Clark called a cooperator, G., who informed

---

[27] Tr. 40.

[28] Tr. 21.

[29] Tr. 39.

[30] Tr. 21, 39.

[31] Tr. 21.

[32] Tr. 21. Officer Clark could not recall whether the house was guarded by uniformed or plain-clothed officers. Tr. 44-45.

[33] Tr. 22.

6

him that Torres was aware that police had been in his house that day.[34]

22. Officer Clark asked G. to pick up Torres and drive him to the area of East Tusculum Street and Kensington Avenue.[35] As directed, G. drove Torres down the 2700 block of Kensington Avenue, slowing at East Tusculum Street,[36] where he voluntarily stopped the vehicle for task force officers three-quarters of a block from Torres's home.[37]

23. Torres was removed from the car and a frisk was conducted.[38] Torres was frisked "based on the observation of shotgun shells in the residence, previous information of the violence with the organization and weapons recovered."[39] He was not carrying a weapon.

24. Despite finding no weapons or suspected weapons during the frisk, the police searched the contents of Torres's pockets and found a house key, a cell phone, $108 in cash, and a single bullet.[40] These items were also listed in the search warrant application.

25. Torres was then detained "for investigation,"[41] without an arrest warrant or probable cause,[42] for approximately ninety minutes while the search warrant for the house was obtained,

---

[34] Tr. 22.

[35] Tr. 22.

[36] Aff. of Prob. Cause.

[37] Tr. 23.

[38] Tr. 49.

[39] Tr. 23.

[40] Tr. 23.

[41] Tr. 23.

[42] Tr. 52. The Assistant United States Attorney acknowledged, on the record, that "a single bullet isn't enough to really hold him on suspicion of major drug felony and firearm charges." Tr. 75-76.

7

and then while the warrant was executed.[43] Torres was not free to leave during that time.

26. When the search warrant was issued, the police reentered the house. Their search of the house revealed a loaded sawed-off shotgun under the couch cushions, another shotgun under a mattress, approximately 450 packets of heroin stamped "Nite Life," over $2000 in cash, a marijuana grinder and other drug paraphenalia, ammunition, and a loaded submachine gun under floorboards in a bedroom.[44]

27. In the same bedroom where the submachine gun was found, officers found documents connecting Torres to the house, including his medical card and a strip of photographs of Torres and his girlfriend.[45] The key found during the search of Torres's person also connected Torres to the property, as it unlocked the front door.[46] The officers also found evidence which confirmed that Christopher lived in the house, as he had told the arresting officers.[47]

28. After seizure of the drugs, weapons, and other evidence in the home, Torres was formally arrested and charged with narcotics and firearm violations,[48] more than ninety minutes after he was stopped, frisked, and then searched and detained.

## II. DISCUSSION

The Fourth Amendment to the Constitution provides:

---

[43] Tr. 24.

[44] Tr. 24-30.

[45] Tr. 25.

[46] Tr. 23.

[47] Tr. 36.

[48] Tr. 25.

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[49]

Under certain, well-delineated circumstances, warrantless searches are permitted.[50] Absent such circumstances, evidence found pursuant to a warrantless search must be suppressed, and any derivative evidence, even if found pursuant to a warrant, must also be suppressed as fruit of the poisonous tree.[51]

Here, Defendant challenges a "protective sweep" of his residence and a search of his person, which were both conducted without a warrant, and seeks the suppression of evidence found during those searches. He also challenges the second search of his residence, for which officers had a warrant, arguing that because the affidavit of probable cause on which the bail commissioner relied in issuing the warrant contained evidence obtained during the two illegal searches, evidence found during the warranted search is inadmissible as "fruit of the poisonous tree."

The government argues that the "protective sweep" of the residence and the search of Torres's pockets fell into established exceptions to the general prohibition against warrantless searches. It further argues that there was probable cause to issue the search warrant, with or without the evidence obtained during those warrantless searches, as the affidavit of probable cause set forth grounds for a search warrant which were independent of the challenged,

---

[49] U.S. Const., amend. IV.

[50] Horton v. California, 496 U.S. 128, 133 n.4 (1990).

[51] United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992).

9

warrantless searches.

Where a search warrant is issued based upon an affidavit of probable cause which describes evidence discovered during a search or seizure later found to be unlawful, a reviewing court "'should excise the tainted evidence [and the fruits thereof] and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'"[52] The Third Circuit has held that "'even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit.'"[53]

### A. The First (Warrantless) Search of 1812 E. Tusculum Street

Searches and seizures within a home, without a warrant, are presumptively unreasonable.[54] "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, the threshold may not reasonably be crossed without a warrant."[55] However, where the exigencies of the situation are compelling, courts have recognized certain exceptions to the warrant requirement. For example, officers may enter and search a home without a warrant if they have probable cause to believe there is contraband therein and they reasonably believe there is an *imminent risk* that evidence will be destroyed or removed before they can secure a search warrant.[56]

---

[52] Id. at 1138 (quoting United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987)).

[53] Id. (quoting United States v. Johnson, 690 F.2d 60, 63 (3d Cir. 1982)).

[54] Kentucky v. King, 131 S. Ct. 1849, 1865 (2011).

[55] Payton v. New York, 445 U.S. 573, 590 (1980).

[56] King, 131 S. Ct. at 1856; United States v. Rubin, 474 F.2d 262, 268 (3d Cir. 1973); United States v. Coles, 437 F.3d 361, 365-66 (3d Cir. 2006) (emphasis added).

Here, the government argues that the officers held a reasonable belief that Torres or his girlfriend remained in the house and might destroy evidence if police did not enter the premises quickly after Christopher's arrest. This, the government argues, justified officers' entry into the home to determine whether anyone remained therein. The officers did not conduct a search for contraband during this protective sweep; having determined that the premises were unoccupied, the officers observed ammunition which was left in plain sight, went outside, and secured the property while they sought a warrant to conduct a search for contraband in the home.

The officers included the ammunition observed in plain sight in the Affidavit of Probable Cause for the search warrant. However, for the reasons set forth below, the Court finds that if this evidence were excised from the Affidavit of Probable Cause, the Affidavit was still sufficient to justify a search warrant. As the Court finds that the second, warranted search of the residence was justified by the independent source doctrine, and the ammunition found during the protective sweep would, inevitably, have been discovered, the Court need not decide whether the warrantless protective sweep of the apartment was unlawful. Therefore, the Court will not suppress the ammunition, as it would have been discovered inevitably during the search pursuant to the warrant in any case.[57]

B. The Stop, Search, and Detention of Torres

Police may conduct a Terry[58] stop when the officers have reasonable suspicion, based on the totality of the circumstances, that an individual is engaged in criminal activity.[59] During a

---

[57] Nix v. Williams, 467 U.S. 431, 443 (1984).

[58] Terry v. Ohio, 392 U.S. 1 (1968).

[59] United States v. Mathurin, 561 F.3d 170, 174 (3d Cir. 2009).

11

Terry stop, if officers have reasonable suspicion that a person is armed and dangerous, they can conduct a protective pat-down and remove any weapons found. Terry stops must be temporary in duration and "last no longer than is necessary to effectuate the purpose of the stop."[60] Any protective search must be a "carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault [officers]."[61]

A more thorough search requires probable cause.[62] Probable cause is also required if police wish to detain an individual beyond the brief investigatory stop.[63] This means the officer must have "'reasonably trustworthy information or circumstances . . . [from which] a person of reasonable caution [can] conclude that an offense has been or is being committed [by the person being arrested].'"[64]

The police officers in this case escalated both the detention and the search of Torres from a stop and frisk to a full search and informal arrest without probable cause. A pat-down of Torres would have revealed that he was not carrying a firearm or other weapon.[65] Officers did not articulate probable cause to search of Torres's person, yet they conducted such a search, finding a cell phone, some cash ($108), a house key and a .380 round of ammunition in his pockets. Though the government admits that these items were insufficient to hold Torres on

---

[60] Florida v. Royer, 460 U.S. 491, 500 (1983).

[61] Terry, 392 U.S. at 30.

[62] United States v. Navedo, 694 F.3d 463, 473 (3d Cir. 2012).

[63] Id.

[64] Id. (quoting United State v. Laville, 480 F.3d 187, 194 (3d Cir. 2007)).

[65] Officer Clark, the only officer who testified at trial, did not conduct the search of Torres. It is not clear whether a weapons frisk preceded the detailed search of the contents of Torres's pockets.

12

suspicion of drug or weapons violations,[66] and does not point to any statements or actions by Torres that allowed a <u>Terry</u> stop to blossom into an arrest, Torres was then held for at least ninety minutes while the police obtained a search warrant for Torres's home.[67] Because the search and detention were not supported by probable cause, Torres's rights under the Fourth Amendment were violated. Accordingly, the items found pursuant to this illegal search must be suppressed, and excised from the Affidavit of Probable Cause in analyzing whether it was sufficient to justify a search warrant.

In addition, the Court will excise the entire fifth paragraph of the Affidavit of Probable Cause, because it is misleading. The Court notes with concern the discrepancy between Officer Clark's testimony at the hearing regarding this traffic stop and the description of the stop contained in the Affidavit of Probable Cause. According to Officer Clark's testimony at the suppression hearing, G. was cooperating with police and agreed to pick up Torres and drive him near the 1800 block of East Tusculum Street at Officer Clark's request.[68] The police then stopped G.'s vehicle with G.'s consent, so that they could speak to Torres about an ongoing investigation.[69] The information provided to the bail commissioner indicated that the vehicle stop occurred because Officer Myers recognized the driver, G., through the car window, and knew him as an associate of a drug trafficking organization operating in the area, inaccurately

---

[66] Tr. 75-76.

[67] Had Torres's appearance at the scene been fortuitous, and not directed by the police, the Court might view the legality of detaining him for ninety minutes while a warrant was secured differently. However, that is not the issue before this Court.

[68] Tr. 22-23.

[69] Tr. 23.

implying that Torres was being driven toward his home, in the company of another known drug dealer, for reasons unknown to the police.[70] Because these misleading statements may have led the bail commissioner to make unsupported inferences, the Court will disregard the entire paragraph in determining whether there was probable cause to issue the search warrant.

    C.    <u>The Search of 1812 East Tusculum Street Pursuant to the Warrant</u>

Torres argues that the evidence obtained from the search of his residence must be suppressed because the warrant was tainted by the illegal searches and seizures upon which it was based, and the officers could not establish probable cause for a warrant absent the illegally obtained evidence. As discussed above, the Affidavit of Probable Cause for the search warrant included evidence found pursuant to the first search of Torres's home and the illegal search of his person.

To the extent that the later-discovered evidence was derivative of illegally obtained evidence, it must be excluded as "fruit of the poisonous tree."[71] If the police had an independent basis for discovering the other evidence, however, it will not be excluded.[72] Therefore, the Court must examine whether there was sufficient, untainted information from independent sources to support the search warrant for Torres's home.[73] Specifically, the Court must determine: 1) whether the officers' decision to pursue the warrant was prompted by information gleaned from

---

[70] Officer Clark testified that "Mr. [G.] was still an active cooperator and I was attempting to protect his identity for both his safety and for our operational ability with him." Tr. 43. The Court acknowledges this interest, but believes these concerns may have been addressed without misleading the bail commissioner.

[71] <u>Segura v. United States</u>, 468 U.S. 796, 804 (1984).

[72] <u>Id.</u>

[73] <u>Id.</u> at 813-14.

14

improper searches; and 2) whether a neutral justice would have issued the search warrant if the evidence found during those searches had not been included in the affidavit.[74] Only if the answers are no and yes, respectively, may the evidence seized during the warranted search be admitted.[75]

The Court finds that the decision to seek the warrant was not motivated by information uncovered during the protective sweep, nor by the search and seizure of Torres himself. Officers had the house under surveillance on the basis of previously obtained information about Torres, and had just arrested Christopher leaving Torres's residence with heroin packaged and labeled for sale. Although the sweep of the house did reveal ammunition in plain view, the Court finds that this was not essential to the decision to seek a warrant. The Court also credits Officer Clark's testimony that he was already in the process of preparing the search warrant when the decision to have Torres brought near his home and searched was made. Although items found during a search of Torres's person were included on the warrant application, the decision to pursue the warrant preceded that stop and search.

All items found during both searches were listed in the application for the warrant, and thus were considered by the issuing authority. Therefore, the Court will "purge" the warrant affidavit of the challenged evidence, and determine whether, without those facts, probable cause for a warrant was established.[76] The Court finds that, even after purging the detail about finding shotgun shells from the fourth paragraph, and the entire fifth paragraph of the Affidavit of

---

[74] United States v. Perez, 280 F.3d 318, 339 (3d Cir. 2002); Davis, 383 F. App'x. at 175.

[75] Perez, 280 F.3d at 339.

[76] Perez, 280 F. 3d at 340.

Probable Cause, the affidavit contained ample probable cause to issue the search warrant. Specifically, the second paragraph of the affidavit recites that Christopher Torres exited the property at 1812 East Tusculum, ran when he saw SWAT officers, and dropped 45 packets of heroin packaged for sale and marked "Nite Life." Christopher told officers he lived at 1812 East Tusculum, and he was listed as an occupant on the cover of the warrant application. Since he exited the residence moments before abandoning the drugs, there was a substantial basis to conclude that evidence of drug trafficking might be found at 1812 East Tusculum. As these facts are sufficient to establish probable cause to search the residence,[77] irrespective and independent of the challenged evidence, "a valid search warrant issued, the fruit of that search was not tainted, and thus there was no violation" of Torres's Fourth Amendment rights.[78]

## III. CONCLUSIONS OF LAW

For the reasons set forth above, the Court makes the following conclusions of law:

1. The Court need not rule as to whether the "protective sweep" of Torres's residence was illegal; the ammunition found during that sweep will not be suppressed as its discovery pursuant to the search warrant was inevitable.

2. The detailed search and prolonged detention of Torres after a vehicle stop near his home on March 3, 2011 was illegal, as it was not supported by probable cause. Accordingly, evidence found in Torres's pockets during that search and detention will be suppressed.

2. The bail commissioner could reasonably find probable cause to issue a search warrant for 1812 East Tusculum, even after a portion of the fourth paragraph and the entire fifth

---

[77] United States v. Burton, 288 F.3d 91, 104 (3d Cir. 2002).

[78] Perez, 280 F. 3d at 341.

16

paragraph of the Affidavit of Probable Cause were excised.  Accordingly, evidence found during the warranted search of 1812 East Tusculum, including the ammunition first observed in plain view during the warrantless "protective sweep," will not be suppressed.

    An appropriate Order follows.